**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ALBUQUERQUE CAB COMPANY, INC.,

      Plaintiff,

v.                                                                          Civ. No. 17-1006 SCY/JFR

LYFT, INC., UBER TECHNOLOGIES,
INC., and HINTER-NM, LLC,

      Defendants.

<u>**MEMORANDUM OPINION AND ORDER
DENYING MOTION TO DISMISS**</u>[1]

      Taxi companies in New Mexico are regulated by a state law known as the Motor Carrier Act ("MCA"). With the increasing popularity of Uber and Lyft's alternative ride-share services offered through smartphone apps, in 2016 the New Mexico legislature enacted the Transportation Network Company Services Act ("TNCSA"), which prescribes separate rules for ride-share companies and exempts them from the MCA. Taxi companies like Plaintiff Albuquerque Cab Company, however, felt that prior to 2016 the ride-sharing services had an unfair competitive advantage in the transportation-for-hire market because they did not comply with the existing laws. In this case, Plaintiff is suing on the theory that Defendants should have, but did not, comply with the MCA when they first entered the Albuquerque market. This matter is before the Court on a second motion to dismiss. The Court granted Defendants' first motions to dismiss because Plaintiff's complaint did not satisfy federal pleading standards. Plaintiff has since, however, filed an amended complaint which cures the defects of the original complaint. Accordingly, the Court denies Defendant Uber's motion to dismiss.

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Docs. 20, 22, 23 & 24.

I.       FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff filed its original complaint in state court on August 24, 2017. Doc. 1-1 at 1. The

complaint brought one cause of action against Defendants under the New Mexico Unfair

Practices Act ("UPA"). Defendants Uber Technologies, Inc. and Hinter-NM, LLC (collectively,

"Uber") removed the case to federal court on diversity jurisdiction grounds on October 5, 2017.

Doc. 1. Defendant Lyft, Inc. filed a notice of consent to removal on that same date. Doc. 4.

Plaintiff is an authorized "transportation service carrier" under the MCA and is

authorized by the Public Regulation Commission ("PRC") to provide services as a motor carrier.

*Id.* According to the complaint, Defendants began providing transportation services to the public

in New Mexico around April 2014. Doc. 1-1 ¶ 15. Defendants "provided a tool for requesting

vehicles-for-hire to users who download their free 'smart phone application' ('the App'). Users

who open the App on their mobile phone are shown a map of their location or designated pick-up

point and the available vehicles in that vicinity." *Id.* ¶ 12. Plaintiff alleges that, although

Defendants were "motor carriers" as defined in the Motor Carrier Act, they did not obtain

certificates from the PRC to operate under the Motor Carrier Act. *Id.* ¶¶ 16, 17. Effective May

18, 2016, New Mexico enacted the TNCSA, which "provided a framework to legalize the

Defendants' actions." *Id.* ¶ 26. On August 15, 2016, the PRC enacted regulations pursuant to the

TNCSA "that allowed Defendants to apply for certificates to operate legally in New Mexico." *Id.*

¶ 28. Uber applied for and obtained a certificate to operate under the TNCSA. *Id.* ¶ 29.

Uber and Lyft both filed motions to dismiss the complaint on the primary ground that

neither company is a "transportation service carrier" as defined by the MCA and, therefore, did

not have to comply with the MCA. Docs. 10 & 14. The Court granted both motions, finding that

the original complaint insufficiently alleged that Defendants are "transportation service carriers,"

because the only factual support for that allegation was the mere act of providing a tool to

connect drivers with users. Doc. 37 at 8. "The plain language of the Motor Carrier Act demonstrates that companies who provide this type of connection service, and do no more, are not 'transportation service carriers.'" *Id.* at 9. "If Defendants are correct that their only involvement in the transportation market in New Mexico was to develop and make available software for smart phones, they are also correct that they do not offer or provide transportation of persons for hire by motor vehicle." *Id.* The Court further rejected Plaintiff's argument that Defendants' participation in pre-2016 proceedings before the PRC collaterally estopped them from arguing that the MCA does not govern their activities. *Id.* at 10-12. The Court did not rule on the parties' arguments regarding Plaintiff's standing to bring this suit and whether Plaintiff sufficiently pled causation and damages. *Id.* at 12-15. Finally, the Court permitted Plaintiff to file an amended complaint. *Id.* at 15-16.

Plaintiff filed its Amended Complaint on April 1, 2019. Doc. 38. The Amended Complaint brings the same cause of action under the UPA and contains the same factual background as the original complaint. However, pursuant to the Court's instructions, it contains much more factual detail on Defendants' operations in New Mexico prior to the enactment of the TNCSA. *See generally id.* After Plaintiff filed its Amended Complaint, the parties sought and received a stay of the case while they engaged in settlement negotiations. Doc. 45. Negotiations between Lyft and Plaintiff were successful; accordingly, the Court dismissed Lyft from this case. Doc. 60. Plaintiff and Uber, however, were unable to reach a settlement and so on January 13, 2020, Uber filed the instant Motion to Dismiss Plaintiff's Amended Complaint. Doc. 62. Plaintiff filed a response on February 26, and Uber filed its reply on April 15. Docs. 65 & 69. Briefing is complete and the motion is ready for decision.

## II.      DISCUSSION

Uber makes three arguments in connection with its motion to dismiss the Amended

Complaint: (1) the MCA has never governed it because it has always been a technology company, not a "transportation service carrier"; (2) a recent New Mexico Supreme Court ruling bars Plaintiff from pursuing a cause of action for competitive injury damages under the UPA; and (3) Plaintiff has not plausibly alleged that Uber's failure to obtain a certificate under the MCA caused its damages. The Court finds that the Amended Complaint sufficiently alleges that Uber is more than just a developer and distributor of a smart phone app and, taking Plaintiff's allegations as true, Uber's involvement in the transportation-for-hire market meets the MCA's definition of a "transportation service carrier." Further, the Court finds that the MCA explicitly authorizes Plaintiff's claim for competitive injury damages. Thus, the New Mexico Supreme Court case Uber cites does not bar Plaintiff's cause of action or Plaintiff's theory of causation.

    A.    <u>Plaintiff Plausibly Alleges That Uber Is A Transportation Service Carrier Under The MCA.</u>

The Motor Carrier Act governs "the development, coordination and preservation of a safe, sound and adequate motor carrier system, requiring financial responsibility and accountability on the part of motor carriers through state licensing and regulation of motor carriers." NMSA § 65-2A-2. The Act outlines the powers and duties of the Public Regulatory Commission, *id.* § 65-2A-4, and provides that "[e]very motor carrier providing a transportation service shall meet and comply with the requirements of the Motor Carrier Act and the lawfully adopted rules and orders of the commission," *id.* § 65-2A-7(A). It states that "no person shall offer or provide a transportation service for hire within the state without first obtaining an appropriate operating authority from the commission." *Id.* The Act also specifies that "[i]t is an unfair and deceptive trade practice under the Unfair Practices Act for any transportation service carrier to offer or provide transportation services of a type for which, or in any territory in which, it is not authorized to do so by the commission." *Id.* § 65-2A-33.

4

The Act does not define "transportation service carrier," but does separately define "transportation service" and "motor carrier." "Transportation service" is "transportation . . . offered or provided by a motor carrier." *Id.* § 65-2A-3(LLL). In turn, "motor carrier" and "carrier" are defined in relevant part as "a person offering or providing transportation of persons . . . for hire by motor vehicle." *Id.* § 65-2A-3(FF). "A motor carrier may use employed or contract drivers . . . in the provision of a transportation service." *Id.* § 65-2A-24(B). "[M]otor carriers providing transportation services that use contract drivers . . . remain fully responsible to the commission for complying with all provisions of the Motor Carrier Act and commission rules applicable to transportation service carriers." *Id.* Thus, the question presented is whether Uber "offer[s] or provide[s] transportation of persons for hire by motor vehicle" by "us[ing] employed or contract drivers."

The Court previously found that a person or company who only develops software related to transportation services does not itself offer or provide transportation of persons for hire by motor vehicle. This distinction is important because the MCA clearly applies to any person who "offer[s] or provide[s] a transportation service for hire within the state." NMSA § 65-2A-7(A). Thus, persons who made a living transporting others for a hire "without first obtaining an appropriate operating authority from the commission," *id.*, acted in violation of the MCA, whether or not those persons used an Uber app to facilitate their non-authorized work. Relevant to whether Uber is accountable for the actions of these persons is Uber's level of involvement in, and control over, their actions.

The Amended Complaint offers facts showing that Uber's involvement in the Albuquerque transportation-for-hire market exceeded the simple act of "providing or developing software to drivers and the public." Doc. 38 ¶ 42. According to the Amended Complaint, Uber's

"primary business" is transportation of the public in motor vehicles, attracting drivers and customers to its software platform that it developed several years ago, and collecting payment for rides. *Id.* ¶¶ 44-45. Uber charges its users by the ride and takes a portion of each ride charge, rather than charging users to download the app or setting a monthly subscription fee. *Id.* ¶ 43. Uber and its drivers received remuneration, compensation or reward, paid or promised, in exchange for transportation services. *Id.* ¶ 55.

Thus, the Amended Complaint alleges, Uber's drivers are either its employees, or persons who contract with a motor carrier. *Id.* ¶¶ 50-52. Uber exercised the right to control the details of the manner in which the drivers perform transportation services, as demonstrated by the extensive set of regulations drivers must abide by, including car maintenance standards, personal conduct standards, limits on charges to the public, and limits on tipping. *Id.* ¶ 63. Uber screened drivers before giving them access to the app. *Id.* ¶ 93. At relevant times, Uber leased vehicles to its drivers or provided its drivers with access to special discount leasing programs for the purpose of providing transportation services to the public. *Id.* ¶ 86. For each ride sold to members of the public, the passenger was required to provide Uber, not the drivers, with a credit card and authority to make charges to the card. *Id.* ¶ 87. In some cases, Uber facilitated the adding of a "tip" to the ride charge that was paid to the driver. *Id.* ¶ 88. Uber prohibited drivers from accepting cash for ride charges or tips. *Id.* ¶ 89.

Uber's participation in the transportation market included extensive marketing efforts. *Id.* ¶ 91. Uber negotiated with local and county governments to provide reduced price rides to patrons of bars that have used excessive alcohol. *Id.* ¶ 92. Uber collected and remitted gross receipts taxes to the state for a portion of each ride given by its drivers. *Id.* ¶ 94. Uber provided credit card processing services for each ride given by its drivers and the drivers were prohibited

from giving rides to the public without using Uber's credit card processing service. *Id.* ¶¶ 95-96. According to Uber's guidelines for drivers,

> Uber drivers must "give riders personal space" and follow Uber's safety regulations. Drivers can be cancelled from the service if they cancel more than 5% of their trips. Drivers may not have physical contact with passengers or engage in sexual or romantic dalliances. Drivers are prohibited from using foul language and driving unsafely. Drivers are prohibited from talking on the phone, transporting drugs and other acts defined by the Uber rules. Uber drivers may not carry a gun and must undergo a background check. Drivers must have insurance. Drivers must display the Uber or Lyft decal[.] Drivers' cars must be no more than 15 years old and in good condition. Drivers' cars are inspected.

*Id.* ¶ 98. Uber facilitated the creation and purchase of insurance policies from automobile insurance providers in New Mexico by lobbying New Mexico Insurance Regulators and insurance companies to offer ride share insurance policies to Uber's drivers. *Id.* ¶ 109.

The Court agrees with Plaintiff that the allegations in the Amended Complaint show that, *in addition to* developing an innovative software platform, during the relevant time period Uber had extensive involvement with and control over Uber drivers, and made money from providing transportation services for hire. This case would be quite simple if Uber had indeed only developed a smartphone app, which it then sold to taxi companies in order to, for example, allow customers to hail a cab on their smart phone and view real-time cab locations. In this hypothetical, the software company has no involvement with drivers and makes no money from passengers. But the Amended Complaint demonstrates that is not Uber's role in the transportation services market. These allegations establish that Uber offers or provides transportation of persons for hire by motor vehicle through its employees or contract drivers.[2]

Uber argues that the MCA uses the term "motor carrier" in a manner that suggests the

---

[2] Because the Act applies to Uber whether its drivers are employees or independent contractors, the Court need not resolve the parties' dispute over the legal status of Uber drivers.

term was meant to apply to owners or lessees of vehicles, not persons who provide transportation services via personal vehicles as Uber drivers do. It cites two provisions of the MCA: § 65-2A-24, which states that "[a]n intrastate motor carrier shall not lease a motor vehicle or operate a leased motor vehicle in the course of its transportation service except as provided by commission rule"; and § 65-2A-19, which provides that "[a] motor carrier shall provide safe and adequate service, equipment and facilities for the rendition of transportation services." Doc. 62 at 10. There are two problems with this argument. First, these provisions stipulate the conditions under which a motor carrier may lease vehicles and operate leased vehicles; it does not require them to do so in order to qualify as a motor carrier. Second, the Amended Complaint alleges that Uber did lease some vehicles or provided their drivers with access to special discount leasing programs, Doc. 38 ¶ 86, in addition to using drivers who supply their own vehicles, *id.* ¶ 103.

Uber also objects that "the bulk of Plaintiff's new allegations do not pertain to the timeframe at issue in this lawsuit" (*i.e.*, between 2014 and 2016) and instead refer to Uber's current practices and policies. Doc. 62 at 11 n.8. But the Amended Complaint states that it describes Uber's practices "[a]t all relevant times," *e.g.*, Doc. 38 ¶ 80, and the argument that this allegation is untrue is not appropriate for a motion to dismiss.

Uber next focuses on the significance of the enactment of the TNSCA. It argues that the 2016 enactment of the TNCSA proves that the legislature never intended the MCA to regulate transportation network companies like Uber. Doc. 62 at 8-9. The enactment of legislation specifically directed at ride-sharing services like Uber and Lyft, Uber argues, demonstrates that the legislature knew that the old legal framework was insufficient to govern transportation network companies. "'[W]hen the Legislature enacts a new statute, courts presume that it intended to change the law as it previously existed.'" *Id.* at 9 (quoting *State ex rel. Bird v.*

8

*Apodaca*, 1977-NMSC-110, ¶ 12, 573 P.2d 213) (alterations omitted). In other words, if the legislature thought the MCA regulated companies like Uber or Lyft, it would not have bothered to enact the TNCSA. *Id.* But Plaintiff responds with an equally plausible theory of legislative intent: "The rules of construction and legislative history of the TNC Act show clearly that the Motor Carrier Act before the TNC applied to companies like Uber, and that the TNC Act was intended to change the law to exempt the same companies." Doc. 65 at 6. The legislature did not give any hint as to which theory is more likely than the other, and so the Court finds no assistance in the parties' attempts to guess at the legislature's intent in enacting the TNCSA.

Moreover, as set forth above, although the parties dispute whether Uber was a transportation service carrier or simply developed software to connect passengers with drivers, those unauthorized drivers who made a living through transportation for hire appear to have violated the MCA. The plain language of the MCA demonstrates that it applies to any person who "offer[s] or provide[s] a transportation service for hire within the state." NMSA § 65-2A-7(A). The MCA further requires any person wishing to engage in this activity to "obtain[] an appropriate operating authority from the commission." *Id.* Thus, the MCA's plain language demonstrates that New Mexico did not intend individuals engaged in transportation-for-hire to go unregulated. Relevant to this lawsuit is whether the activity of these drivers, which appear to have violated the MCA, is attributable to Uber.

Accepting Uber's position would require the Court to predict that, in spite of this plain language requiring those who engage in transportation for hire to obtain operating authority, the legislature would have agreed that companies could recruit and train drivers, provide them with the tools to find passengers wanting motor vehicle transportation, enable them to take money from passengers for doing so, and take its own cut for each ride—all with no regulatory

oversight. For example, the Amended Complaint explains that the PRC "required Plaintiff to test drivers for drug and alcohol abuse, required Plaintiff[] to have commercial insurance, required Plaintiff to provide and track maintenance of their vehicles, required Plaintiff to perform criminal background checks on all drivers, required Plaintiff to provide handicap accessible vehicles, required Plaintiff to pay gross receipts taxes, required Plaintiff to pay unemployment insurance and workers compensation for its drivers, required Plaintiff to carry certain safety equipment in each vehicle," and more. Doc. 38 ¶ 119. Although Uber may have voluntarily complied with many of these items (such as background checks on drivers and vehicle maintenance standards), Uber's legal position is that, until New Mexico passed the TNSCA, it need not have because it was completely unregulated. That the TNCSA holds Uber to many of these same public safety standards as the MCA undermines the notion that the legislature would have ever intended ride sharing services like Uber to go completely unregulated. *E.g.*, NMSA § 65-7-8 (imposing financial responsibility standards); *id.* § 65-7-12(A)(2) (requiring background checks on drivers); *id.* § 65-7-13 (regulating vehicle safety). The fact that the standards under the MCA and the TNCSA are somewhat different is not dispositive; it remains implausible that the legislature intended that transportation network companies should have ever operated under *no* public safety standards.

Finally, although the Court reaches this conclusion independently as a matter of the statutory text, its conclusion is bolstered by the Public Regulation Commission's interpretation of the MCA. "[I]t is well settled that courts should accord deference to the interpretation given to a statute by the agency to which it is addressed." *Public Serv. Co. v. New Mexico Pub. Serv. Comm'n*, 1987-NMSC-124, ¶ 12, 106 N.M. 622, 625. The Amended Complaint alleges that the PRC found that Uber is a "transportation service" provider as that term is used in the MCA. Doc.

38 ¶ 40. The legislature entrusted the PRC with the power to "adopt rules, issue orders and

conduct activities necessary to implement and enforce the Motor Carrier Act." NMSA § 65-2A-

4(A)(11). As Uber emphasizes, Doc. 69 at 8, this does not include the power to adopt

unreasonable rules or orders. But the conclusion that Uber was subject to the MCA prior to 2016

is not unreasonable. The Amended Complaint plausibly alleges that Uber was a transportation

service carrier under the MCA prior to the enactment of the TNCSA.

B.      In The Limited Circumstances Provided For In The MCA, New Mexico Supreme
        Court Precedent Does Not Preclude Competitive Injury Claims Brought Under
        The UPA.

Uber correctly points out that the UPA is a consumer protection statute and, as a result,

companies are generally precluded from asserting a UPA cause of action against their

competitors. *Gandydancer, LLC v. Rock House CGM, LLC*, 2019-NMSC-021, ¶ 1, 453 P.3d 434,

436. The MCA, however, authorizes a UPA cause of action for business competitors:

> It is an unfair and deceptive trade practice under the Unfair Practices Act for any
> transportation service carrier to offer or provide transportation services of a type
> for which, or in any territory in which, it is not authorized to do so by the
> commission. The attorney general or a person who has been damaged or who is
> likely to be damaged as the result of such unauthorized service, *including a*
> *shipper, a passenger or an authorized transportation service carrier*, may bring
> an action pursuant to the Unfair Practices Act against the transportation service
> carrier regarding such unauthorized service.

NMSA § 65-2A-33(J) (emphasis added). The parties do not dispute that Plaintiff is an authorized

transportation service carrier under the MCA. Nor do they dispute that a transportation service

carrier, by definition, would be a business competitor of the person violating this section of the

MCA. Therefore, it is reasonable to interpret this provision as explicitly authorizing the kind of

suit Plaintiff brings: a claim that a lawfully operating transportation service carrier is damaged by

the unlawful operation of a transportation service carrier in the same market.

Uber argues that the Court should disregard this provision of the MCA because it is not

its own cause of action; it merely refers to and incorporates the provisions of the UPA, and the UPA does not permit business competitor suits. Doc. 69 at 4-5. There is some appeal to this argument—if the legislature wanted to allow business competitor lawsuits for MCA violations, why would it choose the UPA, which does not otherwise allow such lawsuits, as the vehicle to carry out this goal? And the UPA is not an intuitive vehicle for a business competitor lawsuit, as the parties' current dispute demonstrates. Uber further argues that "by failing to create a separate private right of action, and instead only providing that certain identified parties can pursue claims pursuant to the UPA, the Legislature clearly intended to bind litigants not only to the terms of the MCA, but also those of the UPA." Doc. 69 at 5.

The plain language of the MCA, however, demonstrates that the legislature intended to allow an authorized transportation service carrier to sue a transportation services carrier who operates without authorization. *See* NMSA § 65-2A-33(J) ("an authorized transportation service carrier[] may bring an action pursuant to the Unfair Practices Act against the transportation service carrier regarding such unauthorized service."). Given the Court's above determination that, taking Plaintiff's allegations as true, Uber qualified as a transportation service carrier during the relevant time period, it follows that the "authorized transportation carrier" who may sue is Plaintiff and the "transportation service carrier" who provided unauthorized service, and so may be sued, is Uber. The statute further clearly sets forth the wrong to be addressed in the lawsuit: providing "unauthorized service." If, as Uber argues and the Court agrees, the MCA does not set forth an independent cause of action, through what mechanism can the legislature's intent to allow an authorized transportation carrier to sue an unauthorized transportation carrier for engaging in unauthorized service be carried out? The statute answers this question as well: the action may be "pursuant to the Unfair Practices Act." The Court doubts that the New Mexico

legislature would have authorized transportation carriers to sue unauthorized transportation carriers "pursuant to" the UPA for providing unauthorized service if it did not intend the UPA to allow for such actions in the unique context of MCA violations.

Uber argues that this result leads to an inconsistent application of the UPA and contravenes the New Mexico Supreme Court's binding decision in *Gandydancer*. After all, the competitive injury damages Plaintiff alleges here are similar to the competitive injury damages the New Mexico Supreme Court in *Gandydancer* determined the UPA does not allow. But, while concluding that the competitive injuries at issue in *Gandydancer* were not recoverable under the UPA, the New Mexico Supreme Court also noted, "[i]t is within the purview of the Legislature to expand the zone of interest protected by the UPA to include competitor suits for competitive injury if that is a policy that the Legislature decides to pursue . . . ." 2019-NMSC-021, ¶ 23. In enacting NMSA § 65-2A-33(J) in 2013, it appears the legislature did exactly what the New Mexico Supreme Court in *Gandydancer* contemplated: It chose to place transportation motor carriers like Plaintiff in the zone of interest protected by the UPA (to the extent set forth in the MCA), to include competitor suits for competitive injury.

A conclusion that the legislature carved out an exception to the UPA's general prohibition of competitive injury lawsuits is consistent with the rationale underlying the New Mexico's Supreme Court's decision in *Gandydancer*. In reaching its decision, the New Mexico Supreme Court found that "by removing [in 1971] the phrase 'unfair methods of competition' from both the title and the definition section and from the declaration of unlawfulness, the Legislature intended to remove competitive injury claims from the protected zone of interest." 2019-NMSC-021, ¶ 20. "We also presume that the Legislature intends to change existing law when it enacts a new statute." *Id*. (parenthetically quoting *Benavidez v. Sierra Blanca Motors*,

1996-NMSC-045, ¶ 18, 122 N.M. 209). This rationale leads to the conclusion that the legislature in 2013 intended to change how the UPA is applied so that, under the limited circumstances set forth in the MCA, transportation motor carriers can seek damages under the UPA for competitive injury.

Moreover, in *Gandydancer*, a tension existed between the interests of BNSF (the customer of Rock House, the unlicensed contractor) and GandyDancer (Rock House's licensed competitor). "[F]or example, if GandyDancer were allowed to recover damages under the UPA, and such recovery totaled all of the Rock House assets such that Rock House was rendered bankrupt or judgment proof, the consumer, in this case BNSF, could be effectively precluded from recovering damages under [the Construction Industries Licensing Act), NMSA 1978, §§ 60-13-1 to -59]." 2019-NMSC-021, ¶ 26. This same tension, however, does not exist in the present case. For whatever reason, in passing NMSA § 65-2A-33(J), it appears the legislature decided to put the authorized transportation service carrier on the same footing as the consumer. *See* NMSA § 65-2A-33(J) ("a shipper, a passenger [the consumer] or an authorized transportation service carrier [the competitor], may bring an action pursuant to the Unfair Practices Act against the transportation service carrier regarding such unauthorized service"). The Court does not question this policy because, as the New Mexico Supreme Court recognized in *Gandydancer*, policy is within the purview of the legislature and courts should refrain from creating policy. 2019-NMSC-021, ¶ 23. Because the legislature placed the consumer and competitor on equal footing in NMSA § 65-2A-33(J), the concern about tension between the consumer and competitor that existed in *Gandydancer* does not exist here.

In sum, finding that a business competitor, *i.e.* a transportation service carrier, cannot bring a UPA claim for MCA violations would render the plain language in § 65-2A-33(J) a

nullity. New Mexico has explicitly authorized a transportation service carrier to sue another transportation service carrier for violations of the MCA, and competitive harm therefore is in the class of harms the statute is designed to protect. In other words, the statute makes it an unfair practice to compete in the transportation-for-hire market in violation of the MCA. Because the Court must construe the statute to avoid nullities, it finds that Plaintiff's cause of action is one specifically contemplated by the legislature in enacting § 65-2A-33(J). This conclusion is not in conflict with *Gandydancer*.

     C.     <u>The MCA Grants Plaintiff Standing To Sue On A Competitive-Harm Theory Of Causation.</u>

Uber argues that the Amended Complaint does not sufficiently link the complained-of conduct and Plaintiff's damages. Doc. 62 at 15-18. In its prior order, the Court found the allegations in the original complaint did "not explain how Defendants' alleged regulatory violations caused Plaintiff's lost revenue or caused Plaintiff to cease business operations." Doc. 37 at 15. "This leaves Plaintiff with the theory that an unlawfully operating company which takes business from a lawfully operating company necessarily damages the lawfully operating company in violation of the UPA." *Id.* The Court, however, ultimately decided it unnecessary to rule on this causation issue in light of its separate ruling that Plaintiff had not stated a claim on the precursor issue of whether Defendants operated unlawfully. *Id.* Now that Plaintiff has stated a claim on the precursor issue of unlawfulness, the Court addresses whether Plaintiff has sufficiently alleged causation between the complained-of conduct and its damages.[3]

Plaintiff alleges that the advantage Uber gained from operating outside the MCA caused

---

[3] Plaintiff also argues that it need not establish damages and causation in order to state a claim under the UPA. Doc. 65 at 15-16. Because the Court finds Plaintiff has adequately alleged facts to support a connection between Uber's alleged unregulated activity and its injuries, the Court need not address this question.

Plaintiff competitive harm: "By operating during the relevant period without authority from the PRC, Defendants enjoyed a significant unfair competitive advantage over Plaintiff." Doc. 38 ¶ 118. Taking Plaintiff's alleged facts as true, the PRC regulations governing Plaintiff prohibited Plaintiff from offering the low prices that Uber was able to offer when it entered the market. *Id.* ¶ 119. Among other things, the PRC required Plaintiff to seek PRC approval for its prices, required Plaintiff to accept every request for a ride, whether profitable or not, and required Plaintiff to pay annual fees to the PRC. *Id.* The PRC prohibited increasing prices during times of high traffic or crises, a practice known as "surge pricing." *Id.* ¶ 120. Plaintiff and Uber served the same customers. *Id.* ¶ 121. Research indicates that Uber's entry into the market did not increase the demand for rides; rather, each Uber ride was one that otherwise would have been given by Plaintiff. *Id.* ¶ 122. The total number of passengers arriving at the Albuquerque International Sunport decreased during the relevant period, meaning Plaintiff had to compete with Uber for a shrinking number of customers. *Id.* ¶ 123. Immediately following Uber's entry into the market, Plaintiff's revenues from trips from the Albuquerque International Sunport to various hotels dropped at a rate higher than can be attributed to the reduction in airport traffic. *Id.* ¶ 127. As a result of operating outside of the regulatory environment, and serving the same customer base, Uber was able to spend less money than Plaintiff on each ride, and therefore able to charge less than Plaintiff. *Id.* ¶¶ 124-25. Since Uber entered the New Mexico market, both major taxi cab companies, which had operated for more than forty years, went out of business. *Id.* ¶ 126.

Uber argues that Plaintiff's allegations are not plausible and Plaintiff is confusing correlation with causation. Doc. 62 at 18-21. True, the fact that Plaintiff went out of business after Uber entered the market does not necessarily mean that Uber's alleged violation of the MCA caused Plaintiff to go out of business. *Id.* at 20. But correlation is evidence of causation.

And, Plaintiff is not attempting to draw significance from a correlation between two random unrelated events. Essentially, Plaintiff alleges that Uber increased the supply of drivers for hire. This, in turn, decreased Plaintiff's market share, which then decreased Plaintiff's revenue. Further, Plaintiff claims, this market saturation had a greater negative effect on it because of Uber's unfair ability to provide rides at a lower cost. Although Uber undoubtedly disputes these factual allegations, at this stage the Court must take them as true. In addition, as described above, the MCA authorizes business-competitor lawsuits and it is thus logical to hold that the MCA authorizes Plaintiff's theory of unlawful-competition-as-harm. The Court finds that Plaintiff's factual allegations related to the decrease in its revenue once Uber began operating in Bernalillo County makes Plaintiff's causation claim plausible and satisfies the pleading requirements of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

## III.     CONCLUSION

Defendants Uber Technologies, Inc. And Hinter-NM, LLC's Motion to Dismiss Plaintiff's Amended Complaint, Doc. 62, is DENIED.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE